IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 16, 2019 Session

## LESTER EUGENE SILER ET AL. v. CHARLES SCOTT ET AL.

**Appeal from the Circuit Court for Campbell County**
**No. 12792     Paul G. Summers, Senior Judge[1]**

---

**No. E2017-01112-COA-R3-CV**

---

This case arises out of an incident in 2004 when five Campbell County deputy sheriffs went to the plaintiffs' residence. The officers ordered the wife of Lester Eugene Siler, and his son, Dakota Siler, to leave the house. The deputies then proceeded to beat and torture Mr. Siler for more than two hours in an attempt to get him to sign a search warrant. Their efforts were to no avail. They arrested Mr. and Mrs. Siler and charged them at the jail with offenses.  These charges were ultimately dismissed. Subsequently, plaintiffs sued the five deputies. In addition, the suit named as defendants, Chief Deputy Charles Scott, Sheriff Ron McClellan, and Campbell County.  The trial court granted separate motions to dismiss filed by Scott and McClellan, finding them to be immune from suit.  Following a lengthy delay, a jury trial took place in 2016.  At the beginning of the trial, the defendants admitted liability on all of plaintiffs' claims.  The jury awarded Lester Siler a total of $90,000 against the individual defendants, and $10,000 against Campbell County. The trial court suggested, and Campbell County accepted, an additur to the awards against the county, increasing them to $25,000.  In a pre-trial ruling, the court held this amount to be the maximum liability against the county for each plaintiff, based on its ruling that sovereign immunity was waived but only to the extent of the $25,000 sheriff's surety bond.  The jury awarded zero damages to Jenny Siler and Dakota Siler.  Plaintiffs raise numerous issues on appeal, asserting, among other things, that the trial court erred in refusing their request to change venue, improperly conducting jury selection, making several errors in the admission and preclusion of evidence, dismissing Scott and McClellan, limiting Campbell County's liability to $25,000 total per plaintiff, incorrectly instructing the jury, and declining their request for attorney's fees.  Plaintiffs further argue that the verdicts were below the range of reasonableness.  We affirm the trial court's judgment.

---

[1] Sitting by designation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Herbert S. Moncier, Knoxville, Tennessee, and Kristie N. Anderson, Jacksboro, Tennessee, for the appellants, Lester Eugene Siler, Jenny Siler, and Dakota Siler.

Arthur F. Knight, III, Knoxville, Tennessee, for the appellee, Campbell County, Tennessee.

Robert L. Bowman and Brandon L. Morrow, Knoxville, Tennessee, for the appellee, Western Surety Insurance Company.

No brief filed by appellees Gerald David Webber, Samuel Reed Franklin, Joshua James Monday, Shayne Christopher Green, William Carroll, Charles Scott, and Ron McLellan.

**OPINION**

**I.**

On July 8, 2004, deputies William Carroll, Shayne Green, Samuel Franklin, Gerald Webber, Jr., and Joshua Monday went to the home of Lester Eugene Siler in Duff, Tennessee, to execute an arrest warrant for a probation violation. They were all in plain clothes. Because of suspicions that Mr. Siler was engaged in continuing drug trafficking activities, the deputies agreed beforehand that they would threaten, intimidate, and physically assault Mr. Siler in order to obtain consent to search his residence. Upon their arrival at the Silers' residence, the defendants told Mr. Siler to go inside his house. They handcuffed him. They then ordered Jenny and Dakota Siler to leave the home so they would not witness the "mess" that was about to ensue. Unbeknownst to the officers, Jenny Siler made a partial audio recording of the interaction with a recording device she turned on before she left the home. It was able to capture about forty-three minutes of the incident. The whole incident lasted approximately two and a half hours.

The specific nature of the abuse is detailed by the recording and transcript, and the stipulations of fact entered into by the deputies, in conjunction with their federal guilty pleas. When the recording begins, and even before Mr. Siler was first asked to consent to a search, the "slapping, striking, or hitting sounds" commenced. Although Mr. Siler remained handcuffed for at least part of the time and offered no physical resistance, he was repeatedly beaten and threatened with serious bodily harm and even death.

-2-

Meanwhile, Jenny and Dakota Siler remained outside the home at the end of their driveway.

Lester Siler's physical abuse, at the hands of the deputies, included slapping, punching, and kicking (resulting in cuts, bruises and a fractured nose) and striking him with a slapjack and a plastic baseball bat. They attached wires from a battery charger to him and threatened to electrocute him. They attempted to force his head into a fish tank full of water, and into an overflowing toilet. The deputies burned Mr. Siler with a cigarette lighter. They threatened to break his fingers and cut off his testicles. They put a pistol in his mouth and set off a firecracker. During the ordeal, the deputies confiscated or stole various items of the Silers' personal property, including a laptop computer, jewelry, money, two security cameras, and a Sony PlayStation. Other personal items in the house were damaged or destroyed. Lester Siler never consented to the search. He and his wife were ultimately arrested and taken to jail. Eventually, all charges against the plaintiffs were dismissed.

The TBI investigated Mr. Siler's allegations of abuse. All five defendants gave sworn written statements to the TBI denying any wrongdoing. The deputies' stories changed when they were confronted with the audio recording. They were charged in federal court with, pleaded guilty to, and received significant prison sentences for conspiring to violate Siler's civil rights under color of law.

On July 6, 2005, plaintiffs filed a civil complaint in federal court alleging "claims under 42 U.S.C. § 1983 based on alleged violations of rights guaranteed by the United States Constitution." *Siler v. Webber*, No. 3:05-cv-341, 2009 WL 10680025, at *1 (E.D. Tenn., filed Jan. 27, 2009). They also asserted eighteen causes of action "based purely on Tennessee state law." *Id.* at *3. The next day, plaintiffs filed their complaint in the instant action, alleging,

> assaults and batteries; malicious harassment; trespass; false arrest; false imprisonment; abuse of process; malicious prosecution; intentional infliction of emotional distress; and violations of their constitutional rights guaranteed to them by the Tennessee Constitution.

On March 27, 2008, nearly three years after the complaint was filed in this case, plaintiffs filed a motion for change of venue, arguing that "due to prejudice and publicity existing in Campbell County . . . a fair and impartial jury trial cannot occur." In their brief, plaintiffs assert that

> [a] one-half day evidentiary hearing was held before
> Campbell County Circuit Court Judge John D. McAfee . . . on
> the Silers' [m]otion for [c]hange of [v]enue. However,
> toward the end of the hearing, Judge McAfee recused himself
> for being too close to interested individuals and did not render
> a ruling. The exhibits and recording of that hearing were lost
> by the [c]lerk and were not available for future hearings when
> conducted on the Silers' motion for change of venue.

There is no order from Judge McAfee in the record, nor is there anything else pertaining to the hearing. On May 2, 2008, the Supreme Court designated Senior Judge Walter C. Kurtz to hear the case.

On July 14, 2008, the trial court entered an order staying the proceedings pending the outcome of plaintiffs' federal lawsuit. The federal district court subsequently entered an order declining to exercise supplemental jurisdiction over plaintiffs' state law claims. *Siler v. Webber*, No. 3:05-cv-341, 2009 WL 10680025, at \*11. The district court ruled that "[p]laintiffs may litigate all of their state law claims against the same defendants in the concurrent, parallel case in the Campbell County Circuit Court." *Siler v. Webber*, 2009 WL 10680026, at \*6 (E.D. Tenn., filed Mar. 5, 2009). Shortly thereafter, the district court granted Campbell County summary judgment on plaintiffs' federal 42 U.S.C. § 1983 claims. *Siler v. Webber*, 2009 WL 10680020, at \*28 (E.D. Tenn., filed Apr. 21, 2009). The Sixth Circuit affirmed this decision. *Siler v. Webber*, 443 Fed. Appx. 50, 51 (6th Cir. 2011).

On July 30, 2010, the trial court granted motions to dismiss filed by defendants McClellan and Scott. The trial court held that these defendants were granted immunity by Tenn. Code Ann. §§ 29-20-310(b) and 8-8-301, a ruling that will be discussed at length later in this opinion.

On April 7, 2011, the trial court entered an order granting defendants summary judgment on claims brought under the Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-205 (2012) and the Tennessee Constitution. The court denied Campbell County's motion for summary judgment on claims based on Tenn. Code Ann. § 8-8-302 (2016), stating,

> the only claims that remain against the County are those
> brought under Tenn. Code Ann. § 8-8-302 for the non-
> negligent, intentional acts of Webber, Franklin, Monday,
> Green and Carroll.

On October 28, 2011, the trial court entered an order denying a change of venue, stating, in pertinent part, as follows:

> [p]laintiffs state that their motion for change of venue was never ruled upon. . . . It was heard by the prior judge, who never ruled upon it before he recused himself. The Court is of the opinion that it is appropriate to attempt to seat a jury. If prior knowledge of the case by persons in Campbell County makes it difficult to seat a jury, then the motion may be renewed. The motion for change of venue is, at this time, DENIED.

(Footnote in original omitted; capitalization in original.) Senior Judge Kurtz retired on December 31, 2012, and was replaced by Senior Judge Paul G. Summers.

On August 3, 2015, the trial court entered an order stating, in pertinent part, that

> The Court finds that Campbell County has waived governmental immunity for the acts of each individual deputy, acting under the color of office, but only up to an aggregate damage value of $25,000. Such waiver is per claimant. This finding is irrespective of the numbers of actors and number of violations; $25,000 is the maximum exposure of the County to each plaintiff or claimant.

Plaintiffs filed a motion in limine to exclude from the venire all Campbell County residents who paid property or sales taxes, arguing that they "have more than a *de minimus* financial interest in the public funds of Campbell County." The trial court denied the motion.

Jury selection took place on October 19, 2016. After the jury was selected and the trial court gave preliminary instructions, all of the defendants informed the trial court in a chambers conference that they were admitting liability on all of the causes of action. For Mr. Siler, these claims were for assault and battery, false arrest, false imprisonment, trespass, abuse of process, malicious prosecution, and failure and neglect to perform duties as a deputy sheriff in violation of their oath of office. Ms. Siler asserted the same claims except assault and battery. Dakota Siler alleged intentional infliction of emotional distress, trespass, and failure and neglect to perform duties as a deputy sheriff. The next morning, the trial court informed the jury that the defendants admitted liability on all claims and consequently, the jury's role was to determine damages, if any.

The jury returned a verdict in favor of Mr. Siler against the individual defendants in the following amounts: William Carroll, $15,000; Samuel Franklin, $15,000; Shayne Green, $20,000; Joshua Monday, $20,000; Gerald Webber, $20,000. The jury awarded Mr. Siler $10,000 against Campbell County. Mrs. Siler and Dakota Siler were awarded no damages. The trial court approved the verdicts against the individual defendants and suggested an additur of $15,000 to Mr. Siler's verdict against Campbell County. The county accepted the additur, resulting in a judgment against it in the amount of $25,000.

Plaintiffs filed numerous post-trial motions, including a motion to amend their complaint to add Western Surety Insurance Company, which issued surety bonds for the Campbell County Sheriff and deputies, as "a necessary and interested party." A decade earlier, Western Surety had been dismissed from the case by agreed order entered on January 19, 2006, finding it "not a necessary party." The trial court denied the motions and plaintiffs' request for attorney's fees. Plaintiffs timely filed a notice of appeal.

## II.

Plaintiffs raise the following issues, as paraphrased from their brief:

1. Did the trial court err in granting defendants summary judgment on plaintiffs' GTLA claims?

2. Did the trial court err in dismissing plaintiffs' claims against McClellan and Scott in their individual and official capacities?

3. Did the trial court err in granting summary judgment on claims for alleged violations of the Tennessee Constitution?

4. Did the trial court in its pre-trial ruling that the liability of Campbell County was limited to the amount of $25,000 per plaintiff?

5. Did the trial court err in denying plaintiffs' motion for change of venue?

6. Did the trial court err in declining to rule that all Campbell County taxpayers were disqualified as having a financial interest in the outcome of the case?

7. Did the trial court deny plaintiffs their right to examine potential jurors during voir dire to establish challenges for cause and make meaningful decisions regarding their peremptory challenges?

8. Were plaintiffs denied their "right to a meaningful preliminary statement, voir dire and opening statement" by the trial court's failure to instruct the jury, at an earlier point in the proceedings, that defendants had admitted liability and the only issue to be decided by the jury was damages?

9. Did the trial court err in refusing plaintiffs' request for late discovery of Mr. Siler's prison psychiatric records?

10. Did the trial court err in refusing to allow plaintiffs to present evidence they deemed as pertinent to damages?

11. Did the trial court err in allowing irrelevant evidence of the individual defendants' punishment and restitution in federal court?

12. Did the trial court err by making improper comments on the evidence?

13. Did the trial court err by providing the jury "incorrect, inconsistent, misleading and confusing instructions"?

14. Did the trial court by refusing to hold that the amounts of the jury's verdicts for damages were below the range of reasonableness, and denying plaintiffs' motion for a new trial on that ground?

15. Did the trial court err in refusing to award plaintiffs their attorney's fees?

16. Did the trial court err in refusing to add Western Surety Insurance Company as a party after the trial was concluded?

17. Did the trial court err by refusing plaintiffs' request to include in its final judgment "the conduct Defendants

admitt[ed] and findings necessary for the [j]udgments against Defendants to be non-dischargeable in bankruptcy"?

## III.

"We review questions of law, including those of statutory construction, *de novo* with no presumption of correctness" accorded to the trial court. **Duke v. Duke**, 563 S.W.3d 885, 894 (Tenn. Ct. App. 2018). We review a jury verdict under the material evidence standard, which requires us to "review the record and 'take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allow all reasonable inferences to sustain the verdict, and discard all countervailing evidence.' " **Borne v. Celadon Trucking Servs., Inc.**, 532 S.W.3d 274, 298 (Tenn. 2017) (quoting **Akers v. Prime Succession of Tenn., Inc.**, 387 S.W.3d 495, 501 (Tenn. 2012)).

## IV.

### A. Summary Judgment for Campbell County on GTLA Claims

Plaintiffs argue that the trial court erred in granting Campbell County summary judgment on their claims brought under the Governmental Tort Liability Act. Our standard of review of a grant of summary judgment is as stated by the Supreme Court:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness.

*     *     *

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving

> party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. . . . The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

*Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015) (italics in original).

The GTLA, Tenn. Code Ann. § 29-20-101 *et seq.*, applies to claims regarding alleged negligent acts by county employees. *Hughes v. Metro. Gov't of Nashville & Davidson County*, 340 S.W.3d 352, 368 (Tenn. 2011); *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 79 (Tenn. 2001); *Doe v. Pedigo*, No. E2002-01311-COA-R3-CV, 2003 WL 21516220, at *2 (Tenn. Ct. App., filed June 30, 2003); *Swanson v. Knox County*, No. E2007-00871-COA-R3-CV, 2007 WL 4117259, at *4-5 (Tenn. Ct. App., filed Nov. 20, 2007). Plaintiffs alleged generally that Campbell County Sheriff's Department employees were negligent in providing inadequate training and supervision of the deputies who committed intentional torts against them. The GTLA provides, in pertinent part, that

> [i]mmunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of:
>
> (1) The exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused;
>
> (2) False imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights[.]

Tenn. Code Ann. § 29-20-205. As an initial matter, we note that the claims brought by Jenny Siler and Dakota Siler all fall within section 205(2). Thus the General Assembly has expressly excepted their claims from the general removal of immunity for negligent acts or omissions of government employees. We affirm the trial court's summary judgment against Jenny and Dakota Siler on the ground that Campbell County is immune under the GTLA.

Lester Siler also brought a claim for negligence resulting in his assault and battery. The Supreme Court has held on at least two occasions that "a governmental entity, under appropriate circumstances, c[an] be held liable for an assault and battery by an employee." **Hughes**, 340 S.W.3d at 368 (citing **Limbaugh**, 59 S.W.3d at 84). However, the trial court granted Campbell County summary judgment on the ground that Mr. Siler's claim is a "civil rights" claim, from which the county is immune. The court stated, in pertinent part, as follows:

> Recent cases have made the ability to recover against the County fairly difficult in police assault cases involving allegations of "civil rights" violations. Immunity is granted the County under the GTLA when the cause of action contends violation of "civil rights." Tenn. Code Ann. § 29-20-205 (2).
>
> In **Campbell v. Anderson County**, 695 F.Supp.2d 764 (E.D. Tenn. 2010), the plaintiff contended that she was sexually assaulted by a reserve deputy sheriff while being transported from a crime scene. She brought suit against Anderson County under the federal civil rights act, 42 U.S.C. § 1983, as well as the GTLA. In addressing the GTLA state law claim, the court stated[,]
>
>> In the alternative, there is a different reason why Campbell's claims against the County for false imprisonment, assault and battery, intentional infliction of emotional distress, and negligence should be dismissed. These torts are alleged to have been committed solely in the context of the violation of Campbell's civil rights – this is in essence a civil rights suit.
>>
>> Tenn. Code Ann. § 29-20-205(2) provides that immunity from suit of all governmental entities is removed or waived for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of "civil rights." It is fair and reasonable to interpret the plain language in § 29-20-205(2) as meaning that

civil rights claims are a type of intentional tort. ***Brooks v. Sevier County***, 279 F.Supp.2d 954, 960 (E.D. Tenn. 2003). This court construes the term "civil rights" in § 29-20-205(2) as meaning and including claims arising under the federal civil rights laws, *e.g.*, 42 U.S.C. § 1983 and the United States Constitution.

Campbell's tort claims of false imprisonment, assault and battery, intentional infliction of emotional distress, and negligence brought against the County under Tennessee law are predicated on the alleged violation of her civil rights by Graham. The contention that former Reserve Deputy Graham committed false imprisonment, assault and battery, and intentional infliction of emotional distress clearly arise out of and directly flow from the allegations that he deprived Campbell of her civil rights by sexually assaulting her. Because Campbell asserts her claims against the County in the context of a civil rights case, her alleged injuries arise out of "civil rights" and the County is entitled to immunity from suit on these claims pursuant to the "civil rights" exception in Tenn. Code Ann. § 29-20-205(2).

*Campbell*, 695 F.Supp.2d at 778. The holding in ***Campbell*** was adopted by a recent Court of Appeals case. *See **Jackson v. Thomas***, 2011 WL 1049804, at *7 (Tenn. Ct. App. Mar. 23, 2011).

Since 2011, when the trial court entered summary judgment, both the federal courts addressing the GTLA civil rights exception and this Court have followed and applied the principles espoused in ***Campbell***. *See **Howard v. Knox County***, No. 3:15-CV-6-TAV-CCS, 2016 WL 9455169, at *10-11 (E.D. Tenn., filed Sept. 7, 2016); ***Lundy v. Knox County,*** No. 3:13-CV-588-TAV-HBG, 2014 WL 1491235, at *4 (E.D. Tenn., filed Apr. 15, 2014); ***Dillingham v. Millsaps***, 809 F.Supp.2d 820, 852 (E.D. Tenn. 2011); ***Johnson v. City of Memphis,*** 617 F.3d 864, 871 (6th Cir. 2010); ***Merolla v. Wilson County***, No. M2018-00919-COA-R3-CV, 2019 WL 1934829, at *4 (Tenn. Ct. App., filed May 1, 2019); ***Lankford v. City of Hendersonville***, No. M2016-02041-COA-R3-

CV, 2018 WL 1559971, at *8 (Tenn. Ct. App., filed Mar. 29, 2018); ***Cochran v. Town of Jonesborough***, No. E2018-01512-COA-R3-CV, 2019 WL 1399514, at *8 (Tenn. Ct. App., filed Mar. 27, 2019); *but see* ***Parker v. Henderson County***, No. W2009-00975-COA-R3-CV, 2010 WL 377044, at *4 (Tenn. Ct. App., filed Feb. 4, 2010).

In the recent ***Cochran*** opinion, this Court discussed at length the cases cited above, recognizing that there is a split of authority in the opinions in that ***Parker***, 2010 WL 377044, was decided contra to the others. The ***Parker*** Court declined to apply the civil rights exception where the plaintiff was shot by a police officer, observing that the plaintiff "neither pleaded nor argued in the present proceeding that the City or its officers violated his federal civil rights." ***Id.*** at *4. In ***Cochran***, we stated that

> [o]ther Tennessee cases, however, decide the issue differently, and the federal courts of Tennessee have consistently applied the civil rights exception in 29-20-205(2) in the stricter manner urged by [the defendant town].

2019 WL 1399514, at *4. Choosing "to follow the greater weight of authority and embrace the application of section 29-20-205(2) that preserves immunity," ***Cochran*** stated that "the injuries [plaintiff] alleges to have suffered stem from well-established civil rights, regardless of how [plaintiff] chose to characterize those claims in his state action." ***Id.*** at *8, *7. The ***Cochran*** Court was:

> unpersuaded by [plaintiff's] argument that because the district court dismissed [plaintiff's] federal claims at the summary judgment stage, there were no civil rights violations, and section 29-20-205(2) is thereby inapplicable. . . . Nothing in the language of section 29-20-205(2) indicates that there must be an express finding that a civil rights violation occurred in order for the exception to apply. Indeed, immunity offered by section 29-20-205 is broad, preserving immunity for negligence claims so long as the "injury arises out of . . . civil rights."

***Id.*** at *8.

The instant case bears many similarities to ***Cochran*** and other cases where a plaintiff alleged police misconduct or assault. Mr. Siler alleged violation of his federal civil rights in his federal action. A claim of excessive force by law enforcement officers often involves the implication of a civil rights violation. *See* ***Cochran***, 2019 WL 1399514, at *7, and cases cited therein; ***Merolla***, 2019 WL 1934829, at *5. Following

the lines of authority culminating most recently in *Cochran* and *Merolla*, we are compelled to conclude that the county's immunity is preserved under the civil rights exception, Tenn. Code Ann. § 29-20-205(2). As *Cochran* observed,

> [i]mportantly, our holding today is in keeping with the well-established principle that "statutes permitting suits against the State must be strictly construed." *Moreno v. City of Clarksville*, 479 S.W.3d 795, 809–10 (Tenn. 2015); *see also Limbaugh*, 59 S.W.3d at 83 ("[A]s the legislature created [the GTLA] in derogation of the common law . . . the Act must be strictly construed.") (citing *Lockhart ex rel. Lockhart v. Jackson-Madison Cty. Gen. Hosp.*, 793 S.W.2d 943 (Tenn. Ct. App. 1990)); *Hughes v. Metro. Gov't of Nashville and Davidson Cty.*, 340 S.W.3d 352, 361 (Tenn. 2011) (quoting *Doyle v. Frost*, 49 S.W. 3d 853, 858 (Tenn. 2001)) ("The GTLA's waiver of immunity is 'narrowly confined in its scope.' ").

*Id.* at *8 (brackets in original). We hold that the plaintiffs' claims against Campbell County fall under the "civil rights" exception and are barred by the county's immunity.

## B. Dismissal of Claims Against McClellan and Scott

Former Sheriff McClellan and former Chief Deputy Scott filed a Tenn. R. Civ. P. 12.02(6) motion to dismiss for failure to state a claim upon which relief can be granted "based upon their immunity as governmental entity employees." The plaintiffs' complaint alleges that McClellan and Scott "failed and neglected to perform the duties required of [them] to train, supervise, and discipline" their subordinate officers. Plaintiffs argue that the trial court erred in granting the motion to dismiss McClellan and Scott in their individual and official capacities on immunity grounds.

In *Jenkins v. Loudon County*, 736 S.W.2d 603, 605 (Tenn. 1987), *overruled on other grounds* by *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 83-84 (Tenn. 2001), the Supreme Court, reviewing the history of law enforcement officer liability in Tennessee, noted that "[a]t common law, the sheriff was personally liable to persons aggrieved by official wrongs of his deputy." (Internal quotation marks omitted). Regarding defendant Scott, plaintiffs cite no authority stating or suggesting that a person with the title of "chief deputy" may be held personally liable for the acts of subordinate deputies. The *Jenkins* Court further observed that

> [a]s the office of the sheriff has evolved, statutory provisions have modified this common law liability, and in 1972, . . . T.C.A. §§ 8–8–301, *et seq.*, was enacted, providing that "[n]o sheriff, whether elected or appointed, nor any surety on his bonds, shall be liable for any wrongs, injuries, losses, damages or expenses incurred as a result of any act or failure to act on the part of any deputy appointed by said sheriff, whether said deputy is acting by virtue of office, under color of office or otherwise."

*Id.* At the same time, Tenn. Code Ann. § 8-8-302 shifted liability "to the county to a limited extent," *id.*, providing that

> [a]nyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office.

Section 8-8-301(a) immunizes former Sheriff McClellan from liability for non-negligent acts of intentional misconduct by his deputies. *O'Neal v. DeKalb County*, 531 S.W.2d 296, 298 (Tenn. 1975); *Jenkins*, 736 S.W.2d at 608; *Hensley v. Fowler*, 920 S.W.2d 649, 651 (Tenn. Ct. App. 1995); *Swanson*, 2007 WL 4117259, at *4. The Supreme Court has held that the GTLA supersedes Tenn. Code Ann. § 8-8-301 *et seq.* regarding actions for negligent conduct. *Jenkins*, 736 S.W.2d at 609; *accord Hensley*, 920 S.W.2d at 652; *Swanson*, 2007 WL 4117259, at *4; *Warnick v. Carter County*, No. E2002-00833-COA-R3-CV, 2003 WL 174754, at *2 (Tenn. Ct. App., filed Jan. 27, 2003).

The trial court dismissed the claims against McClellan and Scott before it ruled that Campbell County was entitled to summary judgment on its GTLA claims, stating,

> the Court finds that, under the facts as alleged in the [c]omplaint, T.C.A. §§ 29-20-310(b) and 8-8-301 confer immunity from suit upon the former sheriff, Ron McClellan and former chief deputy, Charles Scott, and that Defendant Campbell County is the proper party to be named as a defendant as to Plaintiffs' negligence claims under the Tennessee Governmental Tort Liability Act, T.C.A. §§ 29-20-101 *et seq.*, and under T.C.A. § 8-8-302 as to Plaintiff's claims of non-negligent conduct.

-14-

Tenn. Code Ann. § 29-20-310(b) provides immunity for a county employee when the county's immunity under the GTLA has been removed.  It states, in pertinent part, that

> [n]o claim may be brought against an employee or judgment entered against an employee for damages for which the immunity of the governmental entity is removed by this chapter unless the claim is one for health care liability brought against a health care practitioner.

The trial court's judgment in McClellan and Scott's favor under this section must also be construed as a ruling that Campbell County was not immune to liability from a claim that the negligence of its employees was the proximate cause of an assault and battery.  *See **Hill v. City of Germantown***, 31 S.W.3d 234, 238 (Tenn. 2000) (section 310(b) "giv[es] the employee absolute immunity in cases where the municipality's immunity was removed") (quoting ***Erwin v. Rose***, 980 S.W.2d 203, 206 (Tenn. Ct. App. 1998)); ***Fitzgerald v. Hickman County Gov't***, No. M2017-00565-COA-R3-CV, 2018 WL 1634111, at *6 (Tenn. Ct. App., filed Apr. 4, 2018) ("where the governmental entity's immunity is removed, no claim may lie as to an individual employee. . . [O]nly when the governmental entity is immune may the employee be sued under the provisions of section 29–20–310(c).").    While this proposition is generally correct "under appropriate circumstances," ***Hughes***, 340 S.W.3d at 368 (citing ***Limbaugh***, 59 S.W.3d at 84), as already discussed, in this case alleging police assault and battery, the civil rights exception applies to preserve immunity.  Because the trial court later granted summary judgment to the county on immunity grounds under the civil rights exception, Tenn. Code Ann. § 29-20-310(b) does not cloak McClellan and Scott with personal immunity.

Regarding claims for negligence against a government employee, Tenn. Code Ann § 29-20-310(c) provides, in pertinent part, as follows:

> No claim may be brought against an employee or judgment entered against an employee for injury proximately caused by an act or omission of the employee within the scope of the employee's employment for which the governmental entity is immune in any amount in excess of the amounts established for governmental entities in § 29-20-403, unless the act or omission was willful, malicious, criminal, or performed for personal financial gain[.]

In ***Autry v. Hooker***, 304 S.W.3d 356, 363 (Tenn. Ct. App. 2009), this provision was summarized or interpreted as follows:

-15-

An individual employee of a governmental entity is immune when the governmental entity for which he works is immune from suit, unless the employee's act or omission was willful, malicious, criminal, or performed for personal financial gain.

*Accord* **Fitzgerald**, 2018 WL 1634111, at \*7 (quoting **Autry**). If this interpretation is correct, then McClellan and Scott were correctly dismissed under section 310(c), because plaintiffs did not allege that their conduct was "willful, malicious, criminal, or performed for criminal gain." Plaintiffs only alleged that those individuals were negligent in hiring, training and/or supervision of the defendant deputies.

However, the Supreme Court has interpreted section 29-20-310(c) differently than *Autry*. In **Hill**, 31 S.W.3d at 238, the High Court stated,

Reading [§ 29–20–310(b) and (c)] together, it is obvious that the legislature wished to limit the exposure of municipal employees while it selectively removed the immunity of the municipality itself. It did so in two ways: (1) by giving the employee absolute immunity in cases where the municipality's immunity was removed (subsection (b)), and (2) by *limiting the employee's liability in cases in which the municipality was yet immune to the limits in Tenn. Code Ann. § 29–20–403* – unless the employee's acts were willful, malicious, criminal, or performed for personal financial gain (subsection (c)).

(Quoting and "finding to be correct" **Erwin**, 980 S.W.2d at 206; emphasis added; brackets in original). Thus, section 310(c) does not provide immunity for an employee alleged to be negligent; it only limits his or her potential liability to the monetary caps provided at Tenn. Code Ann. § 29-20-403.

Consequently, we must examine the negligence claims against McClellan and Scott personally to determine if the trial court correctly dismissed them. Because this review requires examination of matters outside the pleadings, we apply the summary judgment standard in making this determination. *See* Tenn. R. Civ. P. 12.02.

In ruling on the GTLA claims, the trial court in this case noted that Campbell County "contends that the record shows no negligent act by Sheriff's officials." The trial court, in evaluating this argument, quoted and adopted the findings of the federal district

court, *Siler*, 2009 WL 10680020, at \*17, \*25, \*27, which addressed similar facts in a similar context. The trial court found that

> [w]hile the plaintiff has referred to a great deal of non-material facts, conclusions, and inferences, the Court believes that Judge Edgar, in viewing much the same record, correctly made these salient findings:
>
>> There is no probative evidence that prior to July 8, 2004, McClellan and Scott had any knowledge of the propensity of Webber, Franklin, Monday, Green and Carroll towards violence and use of excessive force. There is no evidence that prior to July 8, 2004, McClellan and Scott were aware of any similar incidents and complaints concerning Webber, Franklin, Monday, Green and Carroll using excessive force or committing acts of violence against criminal suspects or citizens. There is no evidence that prior to July 8, 2004, it was ever necessary for McClellan and Scott to take action to reprimand, discipline, train, and supervise these five deputies to correct and control violent behavior or use of excessive force. There is no evidence that McClellan directed and instructed deputies Webber, Franklin, Monday, Green and Carroll to use any unlawful means or excessive force [to] "get" Lester Siler.
>
> \*     \*     \*
>
>> This is not a case where Campbell County and the CCSD [Campbell County Sheriff's Department] failed to provide supervision for untrained deputies. When Monday, Green, and Carroll went to the Siler residence on July 8, 2004, they were under the direct supervision of experienced, veteran police officers Webber and

-17-

Franklin who were well trained and capable of providing expert guidance and instructions on how to perform the necessary police duties. McClellan and the CCSD did not send inadequately trained deputies Monday, Green, and Carroll to the Siler residence on July 8, 2004, without supervision. The problem was that Webber and Franklin failed to provide proper supervision.

* * *

Plaintiffs have failed to produce sufficient evidence to create genuine issues of material fact on th[e] third element of causation. Plaintiffs cannot show that inadequacy in the CSSD police training program is closely related to or actually caused their injuries. The subject of police training in this case concerns appropriate law enforcement methods for obtaining voluntary consent from a drug trafficking suspect to search his residence. It does not require any special training for a police officer or any reasonable person to know that the extraordinary methods used by the five deputies at the Siler residence on July 8, 2004 were without a doubt unlawful. Whether deputies Monday, Green and Carroll received extensive police training or no training, their understanding of the illegality of their actions would have been the same.

The thirteen-volume technical record in this case contains excerpts of depositions of all the defendants and Mr. and Ms. Siler. McClellan and Scott also each submitted an affidavit. Having reviewed all these materials in the light most favorable to plaintiffs, and drawing all reasonable inferences in their favor, we hold that there is no basis upon which a trier of fact could impose personal liability on McClellan or Scott for negligence. As the trial court observed, there is no proof suggesting that either defendant was aware that the incident was going to take place as it did. Neither is there a showing of previous

incidents of excessive force that would arguably make foreseeable the unlawful acts of the deputies.  The two officers in charge, Webber and Franklin, were well-trained and seasoned veterans capable of supervising the lesser-trained deputies.  In short, the evidence supports the findings of fact made by the trial court and the federal district court.

Regarding the claims against Scott and McClellan in their official capacity, the following principle, recognized in *Doe v. Pedigo*, 2003 WL 21516220 at *4, applies here:

> The United States Supreme Court addressed the difference between individual or personal-capacity claims and official-capacity claims as follows in the case of *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985):
>
>> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent."  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is not a suit against the official personally, for the real party in interest is the entity.  Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

(Internal citations omitted); *see also* *Autry*, 304 S.W.3d at 364 (" 'Official-capacity' suits are in essence another way of pleading an action against the entity represented by the individual defendant.").   Thus, whether plaintiffs' action under the GTLA proceeded against Scott and McClellan "in official capacity," or simply against Campbell County, is of no consequence to the outcome or analysis, because the "real party in interest," *Doe*, 2003 WL 21516220 at *4, and the one liable for damages, if any, would be Campbell County, which is immune.  "[I]n circumstances where [the] GTLA immunizes a

governmental entity, it follows that an officer is also immune when sued in his official capacity." ***Crowe v. Bradley Equip. Rentals & Sales, Inc.***, No. E2008-02744-COA-R3-CV, 2010 WL 1241550, at *4 (Tenn. Ct. App., filed Mar. 31, 2010). Accordingly, the trial court's judgment dismissing McClellan and Scott is affirmed.

### C. Claims for Violation of Tennessee Constitution

The trial court granted summary judgment to the defendants on plaintiffs' state constitutional claims, stating that "Tennessee appears to not recognize actions for damages based on violations of the Tennessee Constitution" and citing ***Bowden Bldg. Corp. v. Tenn. Real Estate Comm'n***, 15 S.W.3d 434, 446 (Tenn. Ct. App. 1999). In ***Bowden***, we stated that "Tennessee . . . has not recognized any . . . implied cause of action for damages based upon violations of the Tennessee Constitution." *Accord, e.g.,* ***Conley v. Tenn. Farmers Ins. Co.***, No. W2017-00803-COA-R3-CV, 2018 WL 3561725, at *7, n.9 (Tenn. Ct. App., filed July 24, 2018); ***Farrar v. State***, No. M2011-02559-COA-R3-CV, 2012 WL 3893522, at *5 (Tenn. Ct. App., filed Sept. 7, 2012); ***Crowe***, 2010 WL 1241550, at *8.[2]

Plaintiffs recognize the holding in ***Bowden***, but argue that "this Court is not bound by ***Bowden*** because of a later reported opinion of this court in ***Mercer v. HCA Health Services of Tenn., Inc.***, 87 S.W.3d 500 (Tenn. Ct. App. 2002)." We disagree. ***Mercer*** did not discuss the principle stated in ***Bowden*** and so many other opinions, and it did not recognize an implied cause of action for damages based upon a Tennessee constitutional violation. We affirm the trial court's judgment on this issue.

### D. Maximum Liability of County under Tenn. Code Ann. § 8-8-303

Campbell County filed a pre-trial motion for partial summary judgment asking the trial court to determine its maximum potential liability under Tenn. Code Ann. § 8-8-303, which the court considered as "a request for declaratory judgment on the issue of maximum liability of a sovereign." As already stated, Tenn. Code Ann. § 8-8-302 allows a person who suffers injury resulting from the non-negligent act of a deputy acting "by virtue of or under color of" the office to sue the county. Section 303(a) limits the extent of the waiver of sovereign immunity, however, providing, as follows:

---

[2] Our research on Westlaw indicates that there are some 53 other judicial opinions that quote or cite ***Bowden*** for this proposition. We will not cite them all, but note that this amount of authority supports the statement made in one of the cases that "it is well established that Tennessee does not recognize an implied private cause of action for damages based upon violation of the Tennessee Constitution." ***Wooley v. Madison County, Tennessee***, 209 F.Supp.2d 836, 844 (W.D. Tenn. 2002).

The governmental immunity of the county in which the sheriff serves is waived for purposes of § 8-8-302, but to an extent not in excess of the amount of the surety bond executed for that county's sheriff pursuant to § 8-8-103.

The interpretation of this provision is at issue here. The surety bond limit in this case is $25,000. Plaintiffs argue that a $25,000 limit should be applied per claimant, for each deputy tortfeasor, and for each separate act of battery. Campbell County argues that the trial court correctly held that the county was potentially liable for $25,000 per claimant, but that limit cannot be multiplied by the number of deputy tortfeasors or the number of batteries committed against Mr. Siler.

This issue has not been addressed or decided by a Tennessee court. A couple of courts have described section 302 only in general terms. *See* **Grundy County v. Dyer**, 546 S.W.2d 577, 580 (Tenn. 1977) (stating section 302 "waives the immunity of the county as to such suits but *only* to the extent of the amount of the sheriff's surety bond" and observing that "the act is not a model of clarity and its draftmanship leaves much to be desired") (emphasis in original); **Currie v. Haywood County**, No. W2010-00453-COA-R3-CV, 2011 WL 826805, at *6 (Tenn. Ct. App., filed Mar. 10, 2011) ("a county's liability for purposes of section 8–8–302 is waived only to the extent of the amount of the sheriff's surety bond").

As an initial matter, for the purposes of section 302, we view what happened at the Siler residence as a single "incident" or "event." Although it lasted several hours, the abuse inflicted on Mr. Siler was continuous and unbroken in time. If the deputies had returned to the Siler residence on multiple occasions to abuse him, for instance, our analysis would likely be different, because we arguably would be dealing with several "incidents." A different statutory maximum liability limit might well apply in such a situation.

Second, we have no hesitancy holding that the $25,000 limit cannot be applied to each separate battery inflicted on Mr. Siler. If that were the case, the county's potential liability would likely easily run into the millions of dollars. Such a result could not reflect the intention of the legislature, because it would effectively eviscerate the statute. As the trial court noted, if plaintiffs' interpretation is correct, "[i]t is not difficult to construct a scenario in which the County could be subjected to extreme and virtually unlimited liability for the acts of multiple officers acting in concert."

The question of the effect of multiple tortfeasor deputies acting in concert on the amount of maximum potential liability for the county is admittedly a much closer one. Does the presence of five deputy defendants, each of whom admitted to committing

-21-

intentional torts against Mr. Siler, mean that the liability is capped at five times $25,000, or $125,000 total? Or does the $25,000 sheriff's bond limit cap the amount of liability at that amount, regardless of the number of deputy tortfeasors? The trial court held the limit was $25,000, reasoning that

> [t]here is no part of Tenn. Code Ann. § 8-8-303(a) which implies the liability limit amount is per deputy or per injury and the language is clear and unambiguous. The limiting language, "but . . . to an extent not in excess of the amount of the surety bond executed for that county's sheriff pursuant to § 8-8-103," does not imply that the limit is per perpetrator . . . It rather establishes a simple numerical limit on the waiver of liability to a given claimant. The County has waived sovereign immunity but only to the total dollar amount equal to a bond compelled by the County and posted by the sheriff.

Plaintiffs' argument on this point is not illogical or unreasonable. In fact, as the trial court recognized, an opinion of the Attorney General, Tenn. Op. Atty. Gen. No. 84-121, 1984 WL 186183, at *3, *8, expressed a view in accord with plaintiffs' position. However, a reading of that opinion reveals that the Attorney General's office simply stated the conclusion that governmental immunity is waived "to the extent of $25,000 as to each deputy," without further analysis or citation to authority. *Id.* at *8.

Although plaintiffs' position is not without merit, we believe the following well-established principles expressed by the Supreme Court ultimately carry the day on this issue. First, "statutes which waive immunity of the governmental entity from suit are to be construed strictly in favor of the sovereign." *Hughes*, 340 S.W.3d at 361 (quoting *McMahon v. United States*, 342 U.S. 25, 27, 72 S.Ct. 17, 96 L.Ed. 26 (1951); internal brackets omitted). Second,

> courts will interpret a statute as waiving the State's sovereign immunity only if the legislation waives sovereign immunity "in 'plain, clear, and unmistakable' terms." *Mullins*, 320 S.W.3d at 283 (quoting *Northland Ins. Co. v. State*, 33 S.W.3d 727, 731 (Tenn. 2000)). A "waiver of sovereign immunity must be explicit, not implicit." *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 853 (Tenn. 2008). In other words, statutes waiving sovereign immunity must "clearly and unmistakably" express the General Assembly's intent to permit claims against the State. *Davidson*, 227 S.W.3d at 19 (quoting *Scates v. Bd. of Comm'rs of Union City*, 196 Tenn.

274, 265 S.W.2d 563, 565 (1954)).  In determining whether a statute satisfies this standard, we focus "on the actual words chosen and enacted by the legislature." ***Mullins***, 320 S.W.3d at 283.   Courts lack authority to abrogate the State's sovereign immunity and must avoid inadvertently broadening the scope of legislation authorizing suits or claims against the State.  ***Hill v. Beeler***, 199 Tenn. 325, 286 S.W.2d 868, 869 (1956).

***Smith v Tenn. Nat'l Guard***, 551 S.W.3d 702, 709 (Tenn. 2018).  Under these principles, if a governmental entity's potential liability under Tenn. Code Ann. § 8-8-303 is the amount of the sheriff's surety bond multiplied by the number of deputy tortfeasors in a given incident, it properly falls to the General Assembly to "clearly and unmistakably" say so.  ***Id.***  We affirm the judgment of the trial court on this issue.

### E. Denial of Motion for Change of Venue

Plaintiffs argue that the trial court erred in refusing to grant their motion to change venue out of Campbell County.  The pertinent statute, Tenn. Code Ann. § 20-4-201 (2009), provides that "venue may be changed, at any time before trial, upon good cause shown, as prescribed in this part."  Tenn. Code Ann. § 20-4-202 states that "venue may be changed by the plaintiff or defendant, or both, but not more than once by each, except for causes not in existence when the first change was taken."  The procedure for requesting a change of venue is set forth in Tenn. Code Ann. § 20-4-203 as follows:

> The party applying for a change of venue shall make a statement of facts, in writing, under oath or affirmation, that the party verily believes that, owing to prejudice, or other causes then existing, the party cannot have a fair and impartial trial in the county, or before the general sessions judge, where the cause is pending, the truth of which statement shall, in a court of record, be verified and supported by the oath of at least three (3), and before a general sessions judge, of one (1) or more, respectable and disinterested persons.

Following the filing of a properly supported petition, Tenn. Code Ann. § 20-4-204 provides that "[i]f the presiding judge, on due consideration, is of the opinion that the cause set forth is good, and the truth of the cause set forth is evident and credibly supported, the presiding judge shall allow the change asked for."

In this action, Ms. Siler filed a motion for change of venue[3] stating in pertinent part as follows:

> Plaintiff, Jenny Siler, makes oath that due to prejudice and publicity existing in Campbell County, Tennessee Plaintiffs' a fair and impartial trial in this County cannot occur [*sic*].

> &ast;  &ast;  &ast;

> The press coverage concerning events in this case has saturated the Campbell County community;

> The Campbell County community is in inalterably [*sic*] prejudiced against Plaintiff Jenny Siler because of her recording of the conduct of the Defendants in this case.

> All of the Defendants['] families live in Campbell County, Tennessee and families of Defendants have actively retaliated against Plaintiff Jenny Siler for her participation in the prosecution of the Defendants;

> Defendants McCellan [*sic*] and Scott are both highly visible public figures in Campbell County, Tennessee and the Campbell County community is both persons [*sic*] prejudiced in their favor or against their favor and have preconceived opinions about this case;

---

[3] The motion was filed almost three years after the complaint. On appeal, Campbell County argues that it was not timely filed, citing **Tenn. Gas Transmission Co. v. Oakley**, 249 S.W.2d 880, 881 (Tenn. 1952), wherein the Supreme Court stated:

> Ordinarily there is no particular set time that a petition for a change of venue should be filed. It should though be filed at the first opportunity after knowledge of the facts upon which the petition is based come to those filing said petition. When this knowledge is shown to have been in the hands of those seeking a change in venue for some days and weeks prior to the request thereof, and under the facts of this case, we think that the petition for a change comes entirely too late.

While we see the merit in the county's argument, it appears it was not raised in the trial court, and therefore our ruling on the venue issue is not based on the ground of untimeliness.

> Even if a jury in Campbell County could be seated in this case, because of the circus like atmosphere that will occur in Campbell County during a trial of this case those jurors cannot be sequestered from that atmosphere.[4]

(Footnote added).

According to plaintiffs' brief, a full hearing took place before Judge McAfee. Plaintiffs describe the events of that hearing as follows:

> Exhibits consisting of news coverage; census materials; and witnesses testified as to the saturation of the Campbell County residents regarding the events and the general hostility of Campbell County residents toward the Silers for getting the deputies in trouble and sent to prison.

> Blue ribbons had been placed throughout Campbell County in support of the Defendants although the horrendous acts they committed recorded on the tape hit national news and they plead guilty to violations of constitutional rights in federal court. Evidence was offered that Jenny Siler was asked to leave places she lived and was turned down employment because she was being blamed by the community for what happened to the officers. A journalist testified that he had covered the events and that in his opinion Jenny Siler could not get a fair trial in Campbell County. Evidence was offered that even the Court Clerk had written [a] letter supporting one of the defendants.

Although the hearing was allegedly recorded, none of this evidence is in the record, because, according to plaintiffs, "the recording and exhibits were left with the clerk in Claiborne County but were lost." There is no indication that plaintiffs made any effort to reproduce or refile any of the above-described proof. Judge McAfee reserved ruling on the venue request and then recused himself.

When the change of venue issue resurfaced some three and a half years later, the trial court denied it, saying that "[i]f prior knowledge of the case by persons in Campbell

---

[4] In their brief, plaintiffs admit that "[t]here were not three . . . verifying the petition, unless Jenny Siler is counted," contrary to the requirements of Tenn. Code Ann. § 20-4-203. Plaintiffs also correctly state that "[t]hat there were only two . . . verifying the petition was never raised by a defendant."

County makes it difficult to seat a jury, then the motion may be renewed." In November of 2015, more than four years later, the trial court ruled that the venue issue "will not be reconsidered unless and until the Court is unable to seat a jury and the motion is subsequently renewed by the Plaintiff[s]." In a pre-trial conference, plaintiffs again brought up the issue, and the trial court responded as follows:

> With all due respect, Mr. Moncier, I think it's inaccurate to say you haven't had a hearing. And this court, whether it's Judge Kurtz, or whether it's Judge McAfee, or whether it's me, has at one time or another given you a say on this issue. Now, apparently, on one of your says, [*sic*] back about eight or nine years ago, you had a lot of evidence; newspaper recordings and newspaper exhibits and maybe recordings and pictures, maybe, and yellow ribbons and evidence and petitions and all that. I don't know what happened to that. I have never seen that. But some judge, whether it was McAfee or Kurtz, with this court ruled on all that evidence. I don't know where it is now. But that wasn't the Court's responsibility to keep up with that. That would have been your responsibility to keep up with that. If you were going to appeal it or reserve it for appeal.

> But be that as it may, that was eight or nine years ago. We are talking about 2016, and what people may or may not know or may or may not feel. Some of the people that probably report to jury duty next Wednesday morning may not have even been out of elementary school when this happened. They may not even know about what happened. Also, I have got enough confidence in Campbell County and those people on that jury that they will tell the truth. And I will allow you plenty of opportunity to voir dire and explore to find out whether or not they are irrevocably bent on doing something for or against any of the defendants. If during this voir dire we find out we cannot pick a jury in Campbell County, then I will reconsider.

> But this is the last time we are going to hear this. And this motion, for both reasons, number one; that you can't pick a fair jury and, number two; that any juror would be irrevocably biased against your client because they are a taxpayer in Campbell County, I have got more faith in the folks of this

county that they will tell me the truth next Wednesday, and will tell you the truth, and will tell the lawyers the truth than, apparently, you do. Therefore, your motion is, once again, quadruply denied.

"Whether to grant a motion for change of venue rests within the discretion of the trial court." **State v. Sexton**, 368 S.W.3d 371, 387 (Tenn. 2012); **State v. Rogers**, 188 S.W.3d 593, 621 (Tenn. 2006) (appendix). In **State v. Hoover**, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979), the Court set forth the "[r]elevant factors to be considered in determining whether to grant a change of venue" as follows:

1. Nature, extent, and timing of pre-trial publicity.

2. Nature of publicity as fair or inflammatory.

3. The particular content of the publicity.

4. The degree to which the publicity complained of has permeated the area from which the venire is drawn.

5. The degree to which the publicity circulated outside the area from which the venire is drawn.

6. The time elapsed from the release of the publicity until the trial.

7. The degree of care exercised in the selection of the jury.

8. The ease or difficulty in selecting the jury.

9. The veniremen's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire.

10. The defendant's utilization of his preemptory challenges.

11. The defendant's utilization of challenges for cause.

12. The participation by police or by prosecution in the release of publicity.

13. The severity of the offense charged.

14. The absence or presence of threats, demonstrations or other hostility against the defendant.

15. Size of the area from which the venire is drawn.

16. Affidavits, hearsay or opinion testimony of witnesses.

17. Nature of the verdict returned by the trial jury.

*See also* **Rogers**, 188 S.W.3d at 621 (adopting and applying **Hoover** factors); **Sexton**, 368 S.W. 3d at 387 (same).

With respect to factors 1, 2, 3, 4, 5, and 12, all pertaining to pre-trial publicity, there is no evidence in the record other than the bare and conclusory few statements in Jenny Siler's affidavit. Although, as noted, plaintiffs' counsel has endeavored to describe what this evidence, once presented to the trial court but then "lost," was, we cannot consider what is not in the technical record. *See* **Levine v. March**, 266 S.W.3d 426, 439 (Tenn. Ct. App. 2007) ("Parties have the responsibility to see to it that the record contains the evidence necessary to support their arguments on appeal"); **Church v. Perales**, 39 S.W.3d 149, 160 (Tenn. Ct. App. 2000) ("We cannot take judicial knowledge of . . . testimony, even if parts of it are cited in the briefs, because it is outside the record"). Similarly, there is no other testimony by any other witness (factor 16), nor proof regarding "threats, demonstrations, or other hostility" towards a party (factor 14). Regarding factors 7, 8, 9, 10, and 11, all of which involve the jury selection process, the trial court was careful and thorough in its attempts to insure that no member of the venire or jury was unduly biased by pre-trial knowledge or conceptions about the case. Jury selection and the voir dire process is further discussed in Section IV(G) below. Factor 6, the "time elapsed from the release of the publicity until the trial," weighs in favor of denying change of venue. As the trial court observed, a very long time – more than twelve years – elapsed between the incident and the trial.

As the Supreme Court has stated,

in order to obtain relief on a claim that the trial court improperly denied a motion for a change of venue, a "defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him." **Rogers**, 188 S.W.3d at 622 (appendix) (citing **State v. Evans**, 838 S.W.2d 185, 192 (Tenn.1992)). "The mere fact that jurors have been

-28-

exposed to pretrial publicity will not warrant a change of venue." ***Rogers***, 188 S.W.3d at 621 (appendix) (citing ***State v. Mann***, 959 S.W.2d 503, 531–32 (Tenn.1997)). "[P]rejudice will not be presumed on the mere showing of extensive pretrial publicity." ***Rogers***, 188 S.W.3d at 621 (appendix) (citing ***State v. Stapleton***, 638 S.W.2d 850, 856 (Tenn.Crim.App.1982)).

***Sexton***, 368 S.W.3d at 387; ***State v. Davidson***, 121 S.W.3d 600, 612 (Tenn. 2003). Plaintiffs have not shown that the jurors were actually prejudiced against them, nor have they shown the "clear abuse of discretion" required to reverse a trial court's venue decision. ***Id.*** We affirm the trial court's denial of a change of venue.

### F. Denial of Motion to Disqualify All Campbell County Taxpayers

Plaintiffs argue that the trial court erred in refusing to disqualify all Campbell County taxpayers under Tenn. Code Ann. § 22-1-104, which provides that "[n]o person may act as a juror in any case in which the person is interested." They state that this is a question of first impression in Tennessee. The trial court reasoned that if all taxpayers were disqualified, "it would be virtually impossible to have a jury venire who is not some kind of taxpayer in Campbell County" and "it would be impossible to pick a jury in Campbell County." Plaintiffs also asked members of the venire if they were Campbell County taxpayers and unsuccessfully tried to challenge them for cause on the ground that they had a financial interest in the outcome of the case. The sole authority plaintiffs cite in support of their argument is ***Parks v. Alexander***, 608 S.W.2d 881 (Tenn. Ct. App. 1980), which dealt solely with the question of a taxpayer's standing to bring a lawsuit, and has no bearing on the issue of juror disqualification.

Although no Tennessee court appears to have addressed this issue, we note that courts in other jurisdictions have almost universally rejected this argument, in the absence of some other factor additional to the simple assertion of taxpayer status. *See* Wanda Ellen Wakefield, Annotation, *Change of Venue as Justified by Fact that Large Number of Inhabitants of Local Jurisdictions Have Interest Adverse to Party to State Civil Action*, 10 A.L.R.4th 1046 (1981) and cases collected and cited therein. As many of these opinions have noted, to accept plaintiffs' argument would be to assume that no fair trial can be conducted in a county or municipality where the governmental agency is a party, among other things. We decline to adopt this as a principle of law in Tennessee. We affirm the trial court's judgment on this issue.

## G. Right to Examine Prospective Jurors

Plaintiffs argue that the trial court denied them their "statutory absolute right" to a meaningful opportunity to examine members of the venire to "establish challenges for cause and to make meaningful decisions as to the exercise of their peremptory challenges." They cite Tenn. Code Ann. § 22-3-101 (2009), which provides that

> [p]arties in civil and criminal cases or their attorneys shall have an absolute right to examine prospective jurors in such cases, notwithstanding any rule of procedure or practice of court to the contrary,

and Tenn. R. Civ. P. 47.01, which states,

> [t]he court shall permit the parties or their attorneys to conduct the examination. . . . The court, upon motion of a party or on its own motion, may direct that any portion of the questioning of a prospective juror be conducted out of the presence of the tentatively selected jurors and other prospective jurors.

The trial court refused plaintiffs' request to provide a written questionnaire to the prospective jurors. The court also denied their request to individually question certain members, out of the presence of the presence of the rest of the venire, about their views of, and opinions about, the case.

In **Sexton**, the Supreme Court provided the following pertinent principles:

> All defendants are entitled to a trial by a jury free of "bias or partiality toward one side or the other of the litigation." **State v. Schmeiderer**, 319 S.W.3d 607, 624 (Tenn. 2010) (appendix). To achieve this goal of fair and impartial juries, voir dire permits questioning by the court and counsel so that certain potential jurors can be properly challenged and stricken. *See* **State v. Akins**, 867 S.W.2d 350, 354 (Tenn.Crim.App. 1993). Trial courts are vested with considerable discretion in conducting the voir dire process. **Schmeiderer**, 319 S.W.3d at 625 (appendix); **State v. Howell**, 868 S.W.2d 238, 247 (Tenn. 1993).

368 S.W.3d at 390.

In this case, jury selection took the entire first day of trial. The potential jurors were asked if they had any preconceived opinions about the case, and those that did were asked if they could lay those opinions aside and decide the case solely on the facts established by the evidence. The trial court instructed the venire not to share their opinions in front of the other potential jurors, and further instructed them as follows:

> We all walk in here with certain opinions about certain things and that's fine. That's life.
>
> The question is can you come in here and have a clean slate so far as what the facts are? That is, can you make sure that you follow the instructions of the Court, and can you make your decision based on the facts that you hear and not on some kind of previous opinion or notion that you may have heard before Court? Can you come in here and do that? Everybody.
>
> Is that – can you come in here and follow the instructions of this Court and can you be a juror like you would want to have sitting with a blank slate free from any prejudices or free from any opinions like you would want to have sitting if your brother or sister was either a plaintiff or a defendant? Can you do that? Let the record reflect that all ten jurors answered that last question in the affirmative.

Plaintiffs' attempts to challenge potential jurors for cause on the ground that they were taxpayers were routinely denied. Plaintiffs used all six of their peremptory challenges on potential jurors who said that they had an opinion about the case, but affirmed that they could set it aside and follow the law as set forth above. Two members of the venire said generally that they believed it would be difficult or unlikely to set aside their preconceived opinions. The trial court granted plaintiffs' requests to strike them for cause.

According to the **Sexton** Court,

> As stated, the manner in which voir dire is conducted rests within the sound discretion of the trial court. **Howell**, 868 S.W.2d at 247. The goal of voir dire is to empanel a jury that is competent, unbiased, and impartial. **State v. Hugueley**, 185 S.W.3d 356, 390 (Tenn. 2006) (appendix); **State v.**

-31-

*Cazes*, 875 S.W.2d 253, 262 (Tenn. 1994); *Howell*, 868 S.W.2d at 247. A juror's prior knowledge about a case does not automatically result in constitutional error. *Murphy*, 421 U.S. at 799–800, 95 S.Ct. 2031; *Hugueley*, 185 S.W.3d at 390 (appendix). The fundamental inquiry "in determining a juror's acceptability is whether his exposure is to matters . . . 'so prejudicial as to create a substantial risk that his or her judgment will be affected.' " *Hugueley*, 185 S.W.3d at 390 (appendix) (quoting Tenn. R.Crim. P. 24(c)(2)(B)). A trial court's determination as to the impartiality of a prospective juror can be overturned only if there has been an abuse of discretion. *State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). Appellate courts must uphold a trial court's ruling with respect to the impartiality of prospective jurors absent a finding of manifest error. *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *Hugueley*, 185 S.W.3d at 390 (appendix).

* * *

Because mere exposure to extrajudicial information does not automatically disqualify prospective jurors, trial courts must assess whether they can serve fairly and impartially given their knowledge of outside information. *See Hugueley*, 185 S.W.3d at 390 (appendix). In making this determination, the trial court must assess the level of potential prejudice arising from the extrajudicial information, as well as the believability of the juror's promise to remain impartial. *See State v. Shepherd*, 862 S.W.2d 557, 569 (Tenn. Crim. App. 1992). Given the wide-ranging availability of information in today's world, it is "quite likely jurors have some level of pre-trial exposure to the facts and issues involved in a case." *Hugueley*, 185 S.W.3d at 390 (appendix).

368 S.W.3d at 395-96 (ellipses in original); accord *Rogers*, 188 S.W.3d at 621 (appendix) ("Jurors may possess knowledge of the facts of the case and may still be qualified to serve on the panel").

Plaintiffs rely on the following statement made by the Supreme Court in 1902:

-32-

It is well settled that, if a person is disqualified as a juror, he should not be accepted because he states that, notwithstanding his opinion, he will render an impartial verdict. ***Rice v. State***, 1 Yerg. 432. When disqualified, he cannot render himself "impartial" by expressing the belief that he can render a fair and impartial verdict according to the law and the proof, notwithstanding the opinion in his mind.

***Turner v. State***, 69 S.W. 774, 779 (Tenn. 1902). The jury selection process in this case did not run afoul of this principle, however. The jurors selected were never "disqualified." It is apparent that the trial court carefully assessed the venire members in the manner prescribed by ***Sexton***. In ***McDonald v. Shea***, No. W2010–02317–COA–R3–CV, 2012 WL 504510, at *20 (Tenn. Ct. App., filed Feb. 16, 2012), we observed that

The trial court *may, within its discretion*, dismiss a juror for cause even if the juror maintains that he or she will be able to set aside the circumstance raising a question as to the juror's impartiality.

(Emphasis added; citing ***Turner***, 69 S.W. at 779). Plaintiffs have cited no authority suggesting that their "absolute right" granted by Tenn. Code Ann. § 22-3-101 encompasses an absolute right to have the venire answer written interrogatories, or to question the potential jurors individually and privately. These are matters left to the sound discretion of the trial court. In summary, we find no abuse of the trial court's discretion in its decisions made during the jury selection process.

## H. Timing of Trial Court's Instruction that Defendants Admitted Liability

Plaintiffs argue that they "were denied their right to a meaningful preliminary statement, voir dire and opening statement by [the trial court] failing to instruct [the] jury that defendants had admitted liability and the jury's duties were only to establish damages." This argument is predicated on the assertion in their brief that "[d]uring a chambers conference before jury selection, Senior Judge Summers was informed that all defendants would admit liability on each claim pleaded by Lester, Jenny and Dakota Siler." The transcript reveals that this statement is inaccurate. The chambers conference took place after jury selection, not before. The trial court informed the jury that all defendants had admitted liability at the earliest reasonable time it could have. Even if it had not, it is difficult to see how, if this would be error, it would be prejudicial or reversible error. This issue is without merit.

## J. Refusal to Allow Late Discovery[5]

Plaintiffs argue that the trial court erred "in denying Lester Siler's motion to provide discovery of psychical [*sic*] and medical records and take depositions for proof from psychiatric and medical experts." There is very little in the record pertaining to this issue. If the plaintiffs made such a motion, it is not included in the record. Nor is the trial court's order ruling on it. In their brief, plaintiffs state,

> The recording of the first hearing before Senior Judge Summers on July 20, 2016, stopped before the hearing was completed hearing [*sic*]. Accordingly, Counsel cannot present the account of what transpired regarding the Silers' request to provide discovery of Lester Siler's psychiatric and medical records after a prior discovery deadline created when Senior Judge Summers was designated.

At trial, defendant Franklin, acting pro se, asked Mr. Siler about his psychiatric records during cross-examination. This triggered a bench conference at which the following colloquy occurred:

> PLAINTIFF'S COUNSEL: [A]fter we appeared before you on June, July 25th or June 25th, and I notified you that I had received information that he had been treated and received psychiatric care for post-traumatic stress syndrome while he was in prison, I recall you telling me that the time has come and passed for that.
>
> However, I issued a subpoena, went through the whole process with regard to getting those records from Davidson County. And, in fact, through the Commissioner and a subpoena, I was able to obtain the psychiatric records, approximately 1,750 pages, and I sent that to all the Defendants in this case.

*        *        *

---

[5] In order to prevent confusion between the letters and the roman numerals used in this opinion, we have skipped the letter "I."

THE COURT: But basically you're talking about records that you – were you attempting to introduce them into evidence?

PLAINTIFF'S COUNSEL: I was until you – I wanted to until you ruled that it was too late to do that and I could not take a deposition for proof or –

THE COURT: That rule stands.

PLAINTIFF'S COUNSEL: I understand that, but my point is that I've got those records, and I presented those records to all the Defendants because I knew what he was going to testify to and he was going to testify to the psychiatric. They have them. I sent them to them.

\* \* \*

DEFENSE COUNSEL: He's testifying to 1,750 medical records. He's backdooring his way into trying to say that these psychiatric records were solely related to this incident and they are not, and that is completely improper. He could have called a psychologist, psychiatrist or anybody at any time over these 12 years and we could have gone into this and cross-examined.

THE COURT: I agree. Your question – the question's improper. Do not repeat, do not ask any more questions about psychiatric records. If you had wanted to call somebody about psychiatric records, if you were to call witnesses, you had that opportunity.

This is the only information in the record that sheds light upon the discovery ruling issue, which plaintiffs characterize as "failing to allow late discovery."

"Because decisions regarding pretrial discovery are inherently discretionary, they are reviewed using the 'abuse of discretion' standard of review." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010); *Funk v. Scripps Media, Inc.*, 570 S.W.3d 205, 210 (Tenn. 2019); *West v. Schofield*, 460 S.W.3d 113, 132 (Tenn. 2015) ("When there is a pretrial discovery dispute, the trial court is afforded discretionary authority").

As a result of this "broad discretion over discovery matters, . . . on appeal, that discretion will not be disturbed absent an affirmative showing that the trial court abused its discretion." *Parks v. Mid-Atlantic Fin. Co.*, 343 S.W.3d 792, 802 (Tenn. Ct. App. 2011); *Artist Bldg. Partners v. Auto-Owners Mut. Ins. Co.*, 435 S.W.3d 202, 220 (Tenn. Ct. App. 2013) ("The decision of the trial court in discovery matters will not be reversed on appeal unless a clear abuse of discretion is demonstrated.") (quoting *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992)). Plaintiffs have not made an affirmative showing that the trial court clearly abused its discretion. We affirm the trial court's judgment on this issue.

## K. Exclusion of Evidence

As already stated, all defendants admitted liability for all claims by all three plaintiffs before presentation of evidence began. Consequently, the only issue left to resolve by the jury was the amount of damages to be awarded each plaintiff. Plaintiffs attempted to introduce portions of each individual defendant's deposition. Some of what plaintiffs attempted to get in was, by their own admission in a bench conference, an effort to get before the jury evidence supporting their argument that Campbell County failed to properly train its deputy sheriffs. The trial court excluded this evidence because it was irrelevant to the question of damages, and cumulative to other proof that was admitted. The admitted evidence included the playing of the gruesome and chilling audiotape recording of the incident in its entirety. Mr. Siler was also given free rein to describe what happened to him during the incident. Generally speaking, plaintiffs were provided a full and fair opportunity to present their evidence pertinent to the issue of damages for the admitted torts committed against them.

"The trial court's decision to admit or exclude evidence will be overturned on appeal only where there is an abuse of discretion." *Mercer v. Vanderbilt Univ.*, 134 S.W.3d 121, 131 (Tenn. 2004). Additionally, even if we were to find error, which we do not, "[t]he erroneous exclusion of evidence will not require reversal of the judgment if the evidence would not have affected the outcome of the trial even if it had been admitted." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). We do not find that the trial court abused its discretion in excluding the proffered evidence.

## L. Evidence of Defendants' Punishment and Restitution in Federal Criminal Court

Plaintiffs requested the trial court to take judicial notice of the individual defendants' federal indictments, guilty pleas and stipulations of fact. Over plaintiffs' objection, Campbell County asked the trial court to also include the judgments reflecting their sentences and restitution ordered, "as a matter of just completeness, it's been before

the jury that they were convicted, the specifics of how long they served, that kind of thing." The trial court allowed the judgments to be entered, stating,

> I think what is only fair is to complete the circle and just go ahead and give the judgment, particularly since part of the judgment is as to restitution.
>
> The Court will instruct and has already instructed that you are to have no sympathy, which includes if you spend time in the federal or the state penitentiary for committing an act, then that does not compensate for damages for the civil act that you might also concomitantly commit.

We agree with plaintiffs that the evidence of defendants' punishment in federal court was not relevant to the issue of damages. However, the trial court provided a curative instruction to the jury stating exactly that

> [p]rior punishment of any Defendant has no bearing on your award of compensatory damages to these Plaintiffs. You shall not consider prior punishment in any manner when considering an award of compensatory damages in a civil case.

Plaintiffs admit in their brief that "the jury was correctly instructed that punishment in federal court could not be considered." Any error in the admission of irrelevant evidence was cured by the correct jury instruction.

## M. Trial Court's Comments on the Evidence

Plaintiffs contend that by making certain comments during the trial, the court violated Article VI, Section 9, of the Tennessee Constitution, which provides that "[t]he Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." The Supreme Court has observed that

> this Section was put in our Constitution to prohibit a practice of "summing up" as was practiced in Great Britain. This "summing up" was telling the jury not what was deposed to but what was proved. The Constitution directly forbids such a practice on the part of the trial court. Under this provision of our Constitution it is error for the trial judge, in his charge

to the jury, to assume any fact as established, however clear it may appear from the evidence.

*Hooper v. State*, 325 S.W.2d 561, 563-64 (Tenn. 1959). More recently, the Supreme Court has provided this guidance:

> Judges are prohibited from commenting upon the credibility of witnesses or upon the evidence in a case. *See* Tenn. Const. art. VI, § 9. . . Therefore, trial judges must be "very careful not to give the jury any impression as to his [or her] feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 407 (Tenn. 1989); *see also Kanbi v. Sousa,* 26 S.W.3d 495, 498–99 (Tenn. Ct. App. 2000). These restrictions apply to comments made when ruling on an objection. *Loeffler v. Kjellgren*, 884 S.W.2d 463, 474 (Tenn. Ct. App. 1994).
>
> Even though judges need to be circumspect in this area, not every comment on the evidence made by a judge is grounds for a new trial. *Kanbi*, 26 S.W.3d at 499. We must consider the trial court's comment in the overall context of the case to determine whether the comment was prejudicial. *State v. Caughron*, 855 S.W.2d 526, 536-37 (Tenn. 1993).

*Mercer*, 134 S.W.3d at 134 (brackets in original).

Plaintiffs state that at some point, the trial court said, "You've made your point. Move on." In our review of the 938-page transcript, we discovered the following discussion that occurred out of the jury's presence:

> PLAINTIFFS' COUNSEL: Specifically, what I'm referring to is when you would speak after Mr. Knight had – through his cross-examination, and say, "I believe you've made your point." That is simply commenting and making comment on the evidence because you agree that he had made the point that he was doing, and you have approved of the point that he was trying to make in that.
>
> THE COURT: No, all I was – I do remember what you say. As a matter of fact, as a matter of fact, when I made that

comment about – I think the comment was, "You've made your picture," not point.

PLAINTIFFS' COUNSEL: That's one of them, yes.

THE COURT: "You've made your picture," not your point. I was not agreeing that the point was well taken or that the point or the picture was true. What I was trying to do is to move him along so he would go on to something else.

We are of the view that no reasonable juror would interpret these two sentences uttered by the trial court as indicating that the court agreed with the point being made and was somehow making a ruling on a matter of fact. This argument is without merit.

## N. Jury Instructions

Plaintiffs cite *Ladd ex rel. Ladd v. Honda Motor Co.*, 939 S.W.2d 83 (Tenn. Ct. App. 1996), for support of their proposition that the trial court committed reversible error by sending its written jury instructions to the jury room. In *Ladd*, this Court stated,

> [p]roviding the jury with a written copy of the instructions can be quite helpful in civil cases. However, unlike the procedure in felony cases, *see* Tenn. R. Crim. P. 30(c), juries in civil cases are not entitled to take a written copy of the trial court's instructions into the jury room. While trial courts must, on request, reduce their jury charge to writing for the benefit of the attorneys in civil cases, Tenn. Code Ann. § 20–9–501 (1994), they are not required to provide a written copy of their instructions to the jury. *In re Estate of Depriest*, 733 S.W.2d 74, 77 (Tenn. Ct. App. 1986); *Smith v. Steele*, 44 Tenn. App. 238, 251, 313 S.W.2d 495, 501 (1956).
>
> The Tennessee Supreme Court entered an order in 1991 proposing an amendment to Tenn. R. Civ. P. 51 to require that juries in civil cases be provided with a written copy of the instructions. The Court withdrew the proposed rule one month later without explanation. Thus, the decision to provide the jury with a written copy of the instructions in a civil case remains discretionary with the trial court.

*Id.* at 104 (internal citations omitted). Apparently, plaintiffs interpret this statement as establishing "the state of the law in Tennessee prohibiting a trial judge in civil cases sending a copy of written instructions to the jury." It clearly does not. ***Ladd*** states that sending written instructions to the jury, while not required, is within the trial court's discretion. It certainly does not stand for the proposition that doing so amounts to reversible error.

Plaintiffs take issue with the following jury instruction:

> It's your duty to find the facts from all the evidence in the case. After you determine the facts, you must apply the law that's given to you whether you agree with it or not.

Plaintiffs argue that "[t]his charge to the jury was meaningless where, during the trial, the Silers were not permitted to offer evidence of the facts in the case." As can be seen, this is nothing more than an attempt to repackage their earlier argument that the trial court erred in excluding the evidence they attempted to get in.

Plaintiffs argue that the following instruction was misleading:

> All Defendants, all six of them, have admitted liability to all Plaintiffs, all three of them, as to all claims. The parties are bound by this agreement. And in your consideration of the evidence you are to treat these facts as proven.

Their argument and reasoning is contained in this cryptic sentence in their brief: "This instruction was misleading to the jury by stating the facts of what each Defendant did to each Plaintiff, was somehow established by the Defendants admitting liability to the legal term used to describe the Plaintiffs['] claims." We are not sure what to make of this argument, but we do note that in its jury instructions, the trial court went through, defined, and explained every element of every legal claim, stating,

> although these have already been proven, I think it's only fair to give you the elements of the different claims that have been made. Remember, you don't have to decide whether these claims such as assault and battery have been made, but I think it's only fair for me to describe what assault and battery is, what trespass is, so on and so forth, so you will understand what the law says about that, and these are in your instructions.

"Under Tennessee law the jury charge will be viewed in its entirety and considered as a whole in order to determine whether the trial judge committed prejudicial error." **Otis v. Cambridge Mut. Fire Ins. Co.**, 850 S.W.2d 439, 446 (Tenn. 1992). We have done this, considering plaintiffs' arguments that the instructions were confusing or misleading. We disagree and find no error in the jury instructions given by the trial court.

### O. Reasonableness of Jury Verdicts

Plaintiffs argue that the trial court erred in refusing to hold that the amounts of the jury's verdicts were below the range of reasonableness, and denying their motion for a new trial on that ground. Regarding the $25,000 award against Campbell County, in Section IV(D) above, we have already held that amount to be the maximum amount recoverable under Tenn. Code Ann. § 8-8-303. Because Campbell County retains immunity from judgments above that limit, no argument Mr. Siler makes regarding the reasonableness of the $25,000 verdict would avail him.

The jury awarded Mr. Siler $20,000 against three of the individual defendants, and $15,000 against the other two. The trial court approved these verdicts as reasonable and supported by the evidence. As stated by the Supreme Court,

> To determine whether a verdict is within the range of reasonableness, the trial judge must consider the credible proof at trial regarding the nature and extent of the injuries, pain and suffering, economic losses including past and future medical bills, lost wages and loss of earning capacity, age, and life expectancy.

**Meals ex rel. Meals v. Ford Motor Co.**, 417 S.W.3d 414, 421 (Tenn. 2013). Moreover, when a trial court approves a verdict in its capacity as thirteenth juror,

> the Court of Appeals' review of the verdict . . . is limited to a review of the record to determine whether the verdict is supported by material evidence. **Poole v. Kroger Co.**, 604 S.W.2d 52, 54 (Tenn. 1980); *see also* **Thrailkill**, 879 S.W.2d at 841; **Ellis**, 603 S.W.2d at 129. Material evidence is "evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." **Knoxville Traction Co. v. Brown**, 115 Tenn. 323, 331, 89 S.W. 319, 321 (1905). An appellate court is required to take "the strongest legitimate view of all

the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and to discard all countervailing evidence." *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 501–02 (Tenn. 2012) (quoting *Barkes v. River Park Hosp., Inc*., 328 S.W.3d 829, 833 (Tenn. 2010)). The material evidence analysis is very deferential to the award by the jury and the judgment of the trial court when it affirms the verdict as the thirteenth juror. *See Ellis*, 603 S.W.2d at 129 ("[W]hen the trial judge has approved the verdict, the review in the Court of Appeals is subject to the rule that if there is any material evidence to support the award, it should not be disturbed." (emphasis added)). "It matters not a whit where the weight or preponderance of the evidence lies under a material evidence review." *Hohenberg Bros. Co. v. Mo. Pac. R.R. Co.*, 586 S.W.2d 117, 119–20 (Tenn. Ct. App. 1979). "It is simply a search of the record to ascertain if material evidence is present to support the verdict." *Id*. Because the material evidence standard lies at the foundation of the right to trial by jury, if there is material evidence to support a jury verdict, the appellate courts must affirm it.

*Id.* at 422-23.

The defendants' conduct in this case was extremely egregious; of that, there is no doubt or contention. Mr. Siler testified at some length regarding the injuries he suffered from the beating and torture at their hands. He did not offer any proof of medical treatment or expenses of any kind. No medical expert testimony was offered. At the time of the incident, his income consisted of $550 per month disability payments, and his revenues from illegally selling prescription drugs. "It has long been recognized that '[t]he amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence.' " *Borne v. Celadon Trucking Servs.*, 532 S.W.3d 274, 309 (Tenn. 2017) (quoting *Reeves v. Catignani*, 157 Tenn. 173, 7 S.W.2d 38, 39 (1928)). Affording the jury the deference it is due in making the factual determination of damages, we cannot say that the verdicts were so far below the range of reasonableness that an additur or new trial should have been granted.

Regarding the verdict of zero to Jenny Siler, the trial court held that

Jenny Siler testified at length during the trial. Plaintiffs' counsel was free to present any witnesses, or proof, of specific, consequential, or incidental damages, but instead relied on repeated attempts to demonstrate the egregiousness of the incidents leading to liability. The Court reminded plaintiffs' counsel multiple times, on the record, that liability was conceded; and the remaining case was about the amount of damages only.

No proof or testimony of actual monetary damages was presented. No proof of medical costs, lost wages, or of any consequential or incidental costs was presented to the jury. No expert testimony was presented regarding any psychological or physiological harm, or costs related thereto, caused by any defendant, to Ms. Siler.

After deliberation, the jury awarded no monetary damages, from any defendant, to Jenny Siler. It is the plaintiff's responsibility to present proof sufficient to persuade the jury to award monetary damages.

The Court cannot create a result that does not logically flow from the proof presented at trial simply because the verdict of the jury was not to the liking of a party.

We do not have much to add to this analysis. The trial court's summary of Ms. Siler's proof, or lack thereof, is accurate. She did not witness the abuse of Mr. Siler. She did not allege any resultant physical injury of her own. At the time of trial, Mr. Siler had spent about ten of the twelve years since the incident incarcerated, and though they were still legally married, the Silers had long since gone separate ways. Ms. Siler admitted that she had been involved in several romantic relationships in the ensuing years.

Regarding Dakota Siler, who was eight years old at the time of the incident, the trial court made similar findings:

Dakota Siler also testified during the case. The Court found him to be a credible witness. The Court particularly notes that, despite many drug related difficulties within his family during his younger years, it appears that Dakota Siler has overcome these challenges and grown into a promising young man. He is presently serving our country in the U.S. Army.

Counsel for plaintiff was free to present any witnesses or proof of specific, consequential, or incidental damages. No evidence of even minimal monetary damages was presented. No proof of medical costs, lost wages, or other incidental costs was presented to the jury. No testimony was presented regarding any physical or psychological harm, caused by any defendant, to Dakota Siler. No proof regarding any amount of monetary damages was presented.

After deliberation, the jury awarded no monetary damages, from any defendant, to Dakota Siler. Based upon a dearth of proof of any compensable damages to Dakota Siler, the Court agrees with the determination of the jury.

Again, the determination of damages is the province of the jury. When the trial court approves the verdict, we cannot lightly invade this province and disturb the jury's determination. We defer to the jury verdicts and affirm the trial court's judgment.

**P. Refusal to Award Attorney's Fees to Plaintiffs**

Plaintiffs requested an award of attorney's fees, which the trial court denied. As grounds for their request, plaintiffs relied upon 42 U.S.C. § 1988, which provides that

[i]n any action or proceeding to enforce a provision of section . . . 1983 . . . of this title, . . . the court, in its discretion, *may allow the prevailing party*, other than the United States, a reasonable attorney's fee as part of the costs.

(Emphasis added.) 42 U.S.C. § 1983 provides, in pertinent part, that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

The complaint does not state a claim for violation of federal constitutional rights, nor does it mention section 1988 or 1983. The trial court stated that it "did not hear any

42 U.S.C. § 1983 issues. Such issues were specifically dismissed by the federal court prior to trial." Plaintiffs cite ***Bloomingdale's by Mail Ltd. v. Huddleston***, 848 S.W.2d 52 (Tenn. 1992) for the proposition that these omissions are not necessarily fatal to their claim for attorney's fees. The ***Bloomingdale's*** Court stated,

> a state court that has subject matter jurisdiction may not deny a party to such proceeding its federal rights. These Federal rights include rights under the Commerce Clause of the U.S. Constitution. *If the party enforcing such rights is successful*, that party is entitled to receive an award of attorneys' fees under 42 U.S.C. § 1988, even though that party did not specifically plead or rely on 42 U.S.C. § 1983 in prosecuting its claim.
>
> The provision that governs the award of attorneys' fees in this case is 42 U.S.C. § 1988. Under that provision, "the court, in its discretion, may allow the prevailing party other than the United States, a reasonable attorneys' fees as part of the costs." Even though the Federal statute provides that a court had discretion in awarding attorneys' fees under 42 U.S.C. § 1988, the cases interpreting that statute state that *the prevailing party* should receive an award, unless there are "special circumstances" that would render an award unjust. ***Blanchard v. Bergeron***, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); ***Monroe v. County Board of Education***, 583 F.2d 263 (6th Cir.,1978).

*Id.* at 56 (emphasis added).

Plaintiffs specifically brought a 42 U.S.C. § 1983 action against defendants in federal court. As noted, the federal court granted Campbell County, McClellan, and Scott summary judgment on these claims, ***Siler v. Webber***, 2009 WL 10680020, at *28, and the decision was affirmed on appeal. ***Siler v. Webber***, 443 Fed. Appx. 50, 51 (6th Cir. 2011). The record contains an order entered by the United States District Court for the Eastern District of Tennessee on July 31, 2012, which recognizes that plaintiffs were granted a voluntary nonsuit against the other individual defendants. The order grants the motions of defendants Franklin, Webber, and Monday to dismiss with prejudice the re-filed 42 U.S.C. § 1983 claims against them on the ground that the applicable statute of limitations had expired. Thus, in this case, plaintiffs have not demonstrated that they are "prevailing parties" in their § 1983 claims against any defendant. Under these particular

circumstances, we do not believe the trial court abused its discretion in declining to order an award of attorney's fees to plaintiffs.

### Q. Western Surety Insurance Company, Issuer of Surety Bonds

Western Surety issued surety bonds for the Campbell County Sheriff and the deputies. On January 19, 2006, the trial court entered an order reflecting the parties' agreement that Western Surety should be voluntarily dismissed because it was not a necessary party to the action. On September 27, 2013, plaintiffs filed a motion to amend their complaint and join Western Surety as an interested party. The trial court denied the motion. After trial, on December 2, 2016, plaintiffs again unsuccessfully tried to amend their complaint to add Western Surety. Plaintiffs argue that the trial court erred in denying their attempts to add Western Surety as a party. Western Surety apparently does not deny its responsibility under the terms of the surety bonds issued, but argues that it was not a necessary party and that plaintiffs' attempts to reinstate it as a party, after agreeing to its voluntary dismissal, were untimely.

Western Surety argues that plaintiffs' attempts to add it were made long after the one year allowed by the saving statute, Tenn. Code Ann. § 28-1-105(a)(2017), which provides,

> If the action is commenced within the time limited by a rule or statute of limitation, but the judgment or decree is rendered against the plaintiff upon any ground not concluding the plaintiff's right of action, or where the judgment or decree is rendered in favor of the plaintiff, and is arrested, or reversed on appeal, the plaintiff, . . . may, from time to time, commence a new action within one (1) year after the reversal or arrest.

Western Surety also relies on *Frazier v. East Tenn. Baptist Hosp., Inc.*, 55 S.W.3d 925, 930 (Tenn. 2001), which held that

> a plaintiff, having timely commenced an action, may take a voluntary dismissal without prejudice (subject to the restrictions of Rule 41.01 and Tenn. Code Ann. § 28–1–105) with respect to one or all defendants in the action, and may commence a new action against the same defendant or defendants by filing a motion to amend and a proposed amended complaint within one year of the order granting the voluntary dismissal.

In this case, plaintiffs waited over seven years to file their first motion to amend. We agree with Western Surety that this was too late.

Moreover, Western Surety's potential role in this case is only as a surety pursuant to Tenn. Code Ann. § 8-19-30, which states that

> Every official bond executed under this code is obligatory on the principal and sureties thereon:
>
> (1) For any breach of the condition during the time the officer continues in office or in the discharge of any of the duties of such office;
>
> (2) For the faithful discharge of the duties which may be required of such officer by any law passed subsequently to the execution of the bond, although no such condition is expressed therein;
>
> (3) For the use and benefit of every person who is injured, as well by any wrongful act committed under color of such officer's office as by the failure to perform, or the improper or neglectful performance, of the duties imposed by law.

In *Ledbetter v. Knox County*, No. 3:05-CV-248, 2006 WL 354200, at *2 (E.D. Tenn., filed Feb. 15, 2006), the federal district court addressed a similar situation and dismissed a surety insurance company, stating that

> Defendant Hartford Insurance Company contends that plaintiff has made no allegations of wrongful conduct against it, except that it is a surety on defendant Hutchison's secured bond pursuant to Tennessee Code Annotated §§ 8-8-103, 8-19-301, and 8-19-302. Defendant Hartford Insurance Company also contends that nothing in Tennessee law authorizes a separate cause of action on the official bond. . . .
>
> The Court has carefully reviewed plaintiff's complaint and can find no allegations against defendant Hartford Insurance Company, except those contained in paragraphs 9, 66, and 68. These paragraphs do not allege defendant engaged in wrongful conduct. They only allege liability based upon the

-47-

bond. Tennessee law does not create a separate cause of liability based upon the sheriff's bond. *See Waters v. Bates*, [227] F.Supp. [462,] 465-66 (E.D. Tenn. 1964). Thus, plaintiff has failed to state a claim against defendant Hartford Insurance Company for which relief may be granted.

Under the authorities cited above, we hold that the trial court did not err in refusing to allow plaintiffs to amend their complaint to add Western Surety as a party defendant.

## R. Request for Findings Pertinent to a Bankruptcy Ruling

Finally, plaintiffs' last argument is that the trial court erred in denying their request to make findings allegedly pertinent to a potential bankruptcy ruling. Specifically, plaintiffs asked the court to make a "finding that the acts were, within the meaning of the bankruptcy code 11 U.S.C. § 423(a)(6) [*sic*: 523(a)(6)] 'willful and malicious by the debtor to another entity or to the property of another entity' thereby making those judgments non-dischargeable in bankruptcy." Plaintiffs cite no authority requiring a trial court to make such a finding, and none holding it to be error to refuse such a request. We are confident that should the issue arise in bankruptcy court, the court will be able to handle it appropriately. We find no error on this issue.

## V.

The judgment of the trial court is affirmed in its entirety. Costs on appeal are assessed against the appellants, Lester Siler and Jenny Siler.

_____
CHARLES D. SUSANO, JR., JUDGE

-48-